[No. B071694. Second Dist., Div. Two. Dec. 14, 1993.]

THE PEOPLE, Plaintiff and Appellant, v.
PAUL VERNON ERWIN, Defendant and Respondent.

## COUNSEL

Gil Garcetti, District Attorney, Diana L. Summerhayes and Patrick D. Moran, Deputy District Attorneys, for Plaintiff and Appellant.

Daniel G. Davis for Defendant and Respondent.

## OPINION

## FUKUTO, J.—

### Introduction

This appeal is taken by the District Attorney for the County of Los Angeles from an order of the superior court granting the Penal Code section 995 motion of respondent and defendant, Paul Vernon Erwin. In the context of a preliminary hearing conducted on the sworn testimony of a law enforcement officer under Penal Code section 872, subdivision (b), this case presents an issue concerning the discretion of a magistrate to permit the defense to call the prosecution's hearsay declarants as defense witnesses upon proper showing under Penal Code section 866, subdivision (a). We affirm the order.

### The Facts

Respondent was charged by felony complaint with committing a lewd act upon a child under 14 years of age in violation of Penal Code section 288, subdivision (a). In accordance with Penal Code section 872, subdivision (b), at the preliminary hearing, the prosecution presented its case through the testimony of Los Angeles County Sheriff's Detective William Looney.

Detective Looney testified to the following facts. On December 18, 1991, the detective met seven-year-old Jessica W., her mother and stepfather at the Norwalk Sheriff's Station. He interviewed Jessica, alone.[1] He asked Jessica if she knew why she was being questioned. She responded that it was "because of what Dr. Erwin" [respondent] did. The detective asked Jessica what respondent did. Jessica said, " 'He touched me. He touched my—my privacy.' " Asked what she meant by her "privacy," Jessica touched the outside of her pants in the area of her vagina or crotch.

Detective Looney asked Jessica to tell him what happened "like a story." Jessica gave the following account. About a week after Halloween, Jessica's mother picked her up after school and took her to respondent's office. Afterward, they went to respondent's house. On the way to his house, respondent bought Jessica a Barbie doll.

When they got to respondent's house, they picked lemons in the yard, ate dinner, and then Jessica put on a little show with the Barbie doll. Later, she

---

[1]First, Detective Looney attempted to determine whether Jessica was competent to testify as a witness in court. He asked her several questions to see if she understood the difference between the truth and a lie. Having satisfied himself that she did understand the difference, Detective Looney asked Jessica if it was good to tell the truth or to tell a lie. Jessica responded that it was good to tell the truth and, if she told a lie, she would get in trouble.

went into the living room with her mother and little brother, and respondent and his wife. Respondent picked Jessica up and put her on his lap, and turned off the light so that Jessica's younger brother could go to sleep. As Jessica was lying on appellant's lap, he started to touch her leg and rub her stomach, and then put his hands underneath her shorts and panties and rubbed on her "privacy." She said that he rubbed her "privacy" and put his finger into her "privacy." All the time respondent was doing this, Jessica was " 'telling God that "I'm going to tell Mom as soon as I can." ' " When her mother returned to the living room, Jessica got up and told her that respondent had touched her privacy, and her mother told respondent that they were leaving.

Respondent picked up Jessica and sat her on a bed in one of the bedrooms and tried to talk her mother out of leaving. Jessica's mother started walking toward the door and respondent picked up Jessica again and sat her on the piano. He started playing the piano and asking them not to leave. Jessica's mother told him they had to leave.

Jessica mentioned to Detective Looney that she had a large bruise near the top of her leg, and indicated the crotch area. She said that respondent had touched the bruise, then touched her "privacy." Detective Looney did mention the bruise in his notes of the interview, but did not mention that it was near Jessica's "privacy."

Jessica's first statement was that respondent touched her "on her privacy." She was asked how respondent touched her privacy, and she said that he rubbed it. Detective Looney's report stated that the incident occurred when everyone except Jessica and respondent had left the room. This was a mistake. Jessica told Looney and another investigator that other persons were in the room when the touching occurred. Judy H., Jessica's mother, told Detective Looney that respondent was never alone with Jessica.

After interviewing Jessica, Detective Looney spoke with Judy H. Judy stated that she went to respondent's office with Jessica and her son, Ryan. Afterward, they went to the home of respondent and his wife for dinner. After dinner, everyone went into the living room and Judy decided to try to get Ryan to go to sleep. Ryan fell asleep and Judy laid him on the couch and went to another room to call her husband to tell him she was going to spend the night at respondent's house. When she returned to the living room, she was met by Jessica, who told her that respondent had touched her "privacy." Judy asked Jessica if she was sure, and the child responded that she was sure. Judy then told respondent that she needed to leave. He tried to persuade her to stay, but she insisted on leaving.

Detective Looney was aware at the time of the interviews that Jessica had previously been the victim of molestation. Jessica indicated at the December 18th interview that she had been victimized previously. The incident involved a juvenile male who had touched her with his fingers in her "privacy." The detective verified that this incident had been reported in Colorado. He omitted this information from his report, believing it was irrelevant to the instant investigation.

Jessica was interviewed by another investigator, Detective Ramos, two days after the incident. She stated to Detective Ramos that she was falling asleep when the molestation allegedly occurred. She told Detective Looney that she was pretending to be asleep. Jessica also told Detective Ramos that her mother was in the room when the touching allegedly occurred, which is different from what she told Detective Looney. Detective Looney made no effort to have Jessica explain these discrepancies in her statements.

At the outset of the preliminary hearing, defense counsel indicated that he understood that the prosecution intended to call the child as a witness, and he planned to call the mother as a defense witness. The prosecutor demanded an offer of proof concerning the testimony expected from the witness, pursuant to Penal Code section 866, subdivision (a). Defense counsel handed the magistrate a written offer of proof in support of his request to call the victim's mother to the stand.[2] After reading the written offer of proof, the magistrate remarked several times that there was a strong possibility that the

---

[2]The offer of proof was not included in the clerk's transcript. On motion of both parties to this appeal, we have augmented the record to include a copy of the written offer of proof submitted to the magistrate. In it, respondent's trial counsel alleges that, if called to the stand, the victim's mother, Judy H. would testify, as follows: "1. She is the mother of the alleged child witness in this case. [¶] 2. At the relevant time, she was a present and percipient witness yet saw nothing akin to molestation occurring. [¶] 3. She can clarify and better establish both physical and communicative relationships of [the] participants at the relevant time to each other, rooms, furniture and other appurtenances of the house in question. [¶] 4. She can establish the extremely good morale [sic] character of defendant who personally denied to her that he had improperly touched her daughter in any manner whatsoever. [¶] 5. She can establish that at the time in question the alleged child witness had a large, recent colored bruise located high in the inner thigh of one leg clearly visible on that day. [¶] 6. She can establish that she and the alleged victim engaged in repeated question and answer demonstration sessions regarding the alleged detail of the touching, definitions of terminology used and versions of interaction among participants at the time in question. [¶] 7. She can establish that the alleged child victim was extremely tired and had been in [a] fast and deep sleep for a period of time immediately before the child allegedly made an accusation of molestation. [¶] 8. She can testify exactly what was said between her and the child at the time of making an initial alleged accusation. [¶] 9. In good faith it is further offered that the child's mother has a better memory of many of the same day's events occurring before and after the alleged incident. [¶] 10. The mother can provide better historic details, facts and circumstances under which the alleged victim in this case had been previously molested in the past for which the

mother's testimony would be relevant to impeach the testimony of the child victim.

When defense counsel was informed that the prosecution intended to proceed under Penal Code section 872 without calling Jessica to the stand, defense counsel sought to reserve the right to call both the victim and her mother as defense witnesses. Counsel made a verbal offer of proof with respect to Jessica's proposed testimony. No final ruling was immediately rendered by the magistrate.

After Detective Looney testified, and the People rested, defense counsel reiterated his demand to call Judy as a defense witness. He made a further, oral offer of proof that if called as a witness, Judy would testify: (1) that she was a percipient witness and that there was no opportunity for appellant to molest; (2) that the living room was full of people; (3) that the lemon picking and Barbie doll incidents occurred not on that day, but at another time; (4) that the location of the bruise was close to Jessica's crotch area; (5) that she talked about the prior molestation of her child "in the presence of the child to the mother and in the presence of the infant boy on that day, on that afternoon prior to this occurring"; (6) that the mother had directed the child to go to sleep, and had seen her in a state of sleep in various positions; (7) that the first statements of the child were generalized statements about her "privacy" and did not involve discussion of the vagina or penetration; (8) that the mother had discussed with the child the meaning in connection with previous multiple molestations, at least one of which was similar or identical to this one; (9) that respondent did not attempt to persuade Jessica and her mother to stay because of the molestation, rather, the mother was having marital problems with her husband and wanted to stay, and respondent and his wife attempted to dissuade them from leaving out of concern for the family because of the late hour and drive; (10) that there was another male there, respondent's son, Mark, who engaged Jessica in a variety of activities in the presence of the mother.

---

child allegedly made highly similar if not identical accusations against another individual. [¶] 11. Taking into consideration the child's testimony, the child's mother may substantially impeach the testimony of the child witness in many respects, including but not limited to, statements of original complaint, nature and existence of the bruise, influence and circumstances of prior alleged molestation at the hands of another individual, occurrences at the location in question while the child was in sleep and observances of the mother made while the child was asleep, not in the same room or reasonably unable to make the same observations."

The magistrate found that, in the spirit of Proposition 115,[3] Evidence Code section 1203.1 had amended Evidence Code section 1203 with the intent to prohibit the defense from calling declarants of the hearsay offered by the prosecution at a preliminary hearing, through the testimony of a sworn officer. The court further found that to permit the defense to call Jessica and her mother as defense witnesses under Penal Code section 866 would circumvent the intent underlying Proposition 115 and Evidence Code section 1203.1.

Respondent filed a Penal Code section 995 motion for dismissal on the ground, among others, that he was denied the right to call defense witnesses at the preliminary hearing after making written and verbal offers of proof in conformity with Penal Code section 866. The superior court ruled that Evidence Code section 1203.1 was not an absolute impediment to the calling of the prosecution's hearsay declarants at the preliminary hearing, and that the magistrate had abused its discretion by refusing to permit the defense to call Jessica's mother as a witness, an adequate offer of proof under Penal Code section 866 having been made.

*Discussion*

I

Appellant contends that the policies and purposes of Proposition 115—to protect victims and witnesses in criminal cases—will be defeated if the superior court's construction of Evidence Code section 1203.1 is permitted to stand. The argument falsely assumes that the provision is ambiguous and in need of judicial construction.

Evidence Code section 1203.1 and Penal Code section 866 were both a part of the comprehensive criminal justice reform measure commonly referred to as "Proposition 115." Those sections must be read in conjunction with Penal Code section 872, as amended by the same initiative measure. Subdivision (b) of section 872 provides in relevant part that, notwithstanding the hearsay rule (Evid. Code, § 1200), at a preliminary hearing, "the finding of probable cause may be based in whole or in part upon the sworn testimony of a law enforcement officer relating the statements of declarants made out of court offered for the truth of the matter asserted." The provision further imposes the requirement that any law enforcement officer testifying as to hearsay statements "shall either have five years of law enforcement

---

[3]Proposition 115, entitled the "Crime Victims Justice Reform Act," was adopted by the voters on June 5, 1990. The measure adopted or changed a number of statutory and constitutional provisions, including those involved in this case.

experience or have completed a training course certified by the Commission on Peace Officer Standards and Training which includes training in the investigation and reporting of cases and testifying at preliminary hearings." (Pen. Code, § 872, subd. (b).)

Evidence Code section 1203 generally codifies an adverse party's right, with certain limitations, to call and examine as if under cross-examination the declarant of a statement that is admitted as hearsay evidence. Section 1203.1 of the Evidence Code provides that section 1203 "is not applicable if the hearsay statement is offered at a preliminary examination, as provided in Section 872 of the Penal Code."

Penal Code section 866 is a specific provision according criminal defendants the right to produce and examine defense witnesses at a preliminary hearing. Post-Proposition 115, that provision states:

"(a) When the examination of witnesses on the part of the [P]eople is closed, any witness the defendant may produce shall be sworn and examined.

"Upon the request of the prosecuting attorney, the magistrate shall require an offer of proof from the defense as to the testimony expected from the witness. The magistrate shall not permit the testimony of any defense witness unless the offer of proof discloses to the satisfaction of the magistrate, in his or her sound discretion, that the testimony of the witness, if believed, would be reasonably likely to establish an affirmative defense, negate an element of a crime charged, or impeach the testimony of a prosecution witness or the statement of a declarant testified to by a prosecution witness."

Appellant suggests that we limit Penal Code section 866's application to witnesses the defense wishes to call *other than the hearsay declarants whose statements were introduced as a part of the People's case.* No such limitation is imposed by the statute, however. Furthermore, the intent to impose such a limitation cannot reasonably be read into Evidence Code sections 1203 and 1203.1. Those provisions apply, by their own terms, to the right of *any* adverse party to call and *cross-examine* a hearsay declarant whose statement is admitted in a legal proceeding. Penal Code section 866 addresses *the right of a criminal defendant* to call and *examine his or her own witnesses* at the close of the People's case in a preliminary hearing.

■ Although the Supreme Court has not directly addressed the particular issue raised by appellants, dictum in at least one post-Proposition 115

decision offers some guidance. In *Whitman* v. *Superior Court* (1991) 54 Cal.3d 1063 [2 Cal.Rptr.2d 160, 820 P.2d 262], the Supreme Court considered various challenges to the use of hearsay evidence at preliminary hearings, under the state and federal Constitutions. The defendant in that case argued, inter alia, that Penal Code section 872, subdivision (b) violated the Sixth Amendment confrontation clause because it contained no provision guaranteeing the reliability of hearsay evidence presented by a sworn law enforcement officer at a preliminary hearing. The Supreme Court rejected the argument, noting that reliability was assured by the experience and training requirements of the statute, the right of cross-examination of the qualified investigating officer, and the defendant's right under Penal Code section 866, subdivision (a) to call *any witness* whose proposed testimony would be reasonably likely to establish an affirmative defense, negate a crime element, or impeach prosecution evidence. (*Whitman* v. *Superior Court, supra*, at p. 1078.) ▮▮▮ The reliability of such hearsay would hardly be guaranteed by a construction of Penal Code section 866 which prohibited, as a matter of law, the calling of any defense witness whose hearsay statements were utilized by the prosecution to establish probable cause.

▮▮▮ Appellant also argues that the order should be reversed because respondent failed to make an adequate offer of proof to support calling the mother or child victim as defense witnesses. In granting the Penal Code section 995 motion, the superior court determined that an adequate offer of proof under Penal Code section 866 had been tendered to support calling the mother as a witness.

Given the relationships of the parties, and the nature of and circumstances attending the alleged act of molestation, we agree that respondent's written and verbal offers of proof sufficed to establish a reasonable possibility that the mother's testimony would substantially impeach in several material respects the victim's several accounts to sheriff's investigators, as retold by Detective Looney. Even the magistrate acknowledged that this was true. The Penal Code section 995 motion was properly granted.

## II

At the preliminary hearing, respondent sought to strike Detective Looney's testimony on the ground that the detective admitted he intentionally refrained from using readily available audio- and videotape recording devices to record Jessica's extrajudicial statements, in part, because the practice of electronic recording might memorialize for exploitation by the defense inconsistencies in a child witness's account of an alleged offense.

The magistrate found that striking the investigator's entire testimony was not an appropriate sanction, given the lack of any evidence that inconsistencies in the victim's statements were in fact held back by the detective. The magistrate denied the motion to strike, noting that respondent's remedy was to present to the jury such evidence of the investigator's intentional failure to use recording devices, to discredit his testimony, or the testimony of the child victim. The magistrate also stated that the court had considered the investigator's practice of not recording the statements of child witnesses in determining the weight to accord his testimony.

█ In the superior court, respondent asserted as another ground for dismissal that he was denied due process by Detective Looney's deliberate failure to preserve and memorialize Jessica's statements with available recording devices. The superior court was troubled by the investigator's admitted practice of refraining from the electronic recording of victim's statements to avoid impeachment, but came to the same conclusion as the magistrate. The court ruled that respondent's remedy was to impeach the prosecution's witnesses by exposing the practice to the jury at trial, and denied the Penal Code section 995 motion as to this particular ground.

On appeal, respondent has raised the issue once again. He contends that the magistrate should have stricken Detective Looney's testimony, and the superior court should have granted his Penal Code section 995 motion on the further ground that he was denied due process by the deliberate failure to electronically memorialize Jessica's extrajudicial statements.[4]

The law falls short of imposing on law enforcement officers a duty to " 'gather up everything which might eventually prove useful to the defense.' [Citations.]" (*People* v. *Hogan* (1982) 31 Cal.3d 815, 851 [183 Cal.Rptr. 817, 647 P.2d 93].) In particular, we know of no authority imposing a duty on the police to use electronic recording devices to collect and preserve all witnesses' statements.

Respondent has made no showing why his confrontation rights are not adequately protected by the right to cross-examine Detective Looney, the right to call and examine any hearsay declarants, including Jessica and her mother, for whom he can make a qualifying offer of proof under Penal Code section 866, and the right to argue to the magistrate that Detective Looney's

---

[4]Detective Looney's stated reason for not tape- or video-recording Jessica's statement was that he adhered to a policy of not using such devices with child victims because they are intimidating. He denied that he specifically refrained from recording Jessica because of the danger of memorializing possible inconsistencies in her statements. He admitted that *one* reason he made it a *policy* not to use recording devices with victims was that inconsistencies "could" be memorialized.

policy of not using available recording devices militates against finding reasonable cause to hold him to answer. (Cf. *People* v. *Walker* (1988) 47 Cal.3d 605, 638 [253 Cal.Rptr. 863, 765 P.2d 70]. Furthermore, if this matter were to have proceeded to trial, respondent could have tried to convince the judge or jury that the detective's deliberate failure to memorialize the child victim's various statements cast reasonable doubt on the veracity of the accusation. (*Id.*, at p. 638, fn. 9.) Imposition of the "sanction" of striking the testimony would have been out of proportion to the detective's offense, given that respondent clearly had other means available to challenge the consistency, accuracy and veracity of the victim's account of the crime. (Cf. *In re Michael L.* (1985) 39 Cal.3d 81, 87 [216 Cal.Rptr. 140, 702 P.2d 222].)

Accordingly, the order appealed from is affirmed.

Gates, Acting P. J., and Nott, J., concurred.

A petition for a rehearing was denied January 7, 1994.